# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case Nos.:     2019AP1085
2019AP1086

†Petition for Review filed

Complete Title of Case

**No. 2019AP1085**

**5 WALWORTH, LLC,**

     **PLAINTIFF,**

  **V.**

**ENGERMAN CONTRACTING, INC., WEST BEND MUTUAL INSURANCE COMPANY AND GENERAL CASUALTY COMPANY OF WISCONSIN,**

     **DEFENDANTS,**

**DOWNES SWIMMING POOL CO., INC. AND THE CINCINNATI INSURANCE COMPANY,**

     **DEFENDANTS-THIRD-PARTY PLAINTIFFS,**

  **V.**

**OTTO JACOBS COMPANY, LLC,**

     **THIRD-PARTY DEFENDANT-APPELLANT,**

**ACUITY, A MUTUAL INSURANCE COMPANY,**

     **THIRD-PARTY DEFENDANT-RESPONDENT.†**

No. 2019AP1086

5 Walworth, LLC,

    Plaintiff,

  v.

Engerman Contracting, Inc.,

    Defendant-Appellant,

West Bend Mutual Insurance Company and
General Casualty Company of Wisconsin,

    Defendants-Respondents,†

Downes Swimming Pool Co., Inc. and The Cincinnati
Insurance Company,

    Defendants-Third-Party Plaintiffs,

  v.

Otto Jacobs Company, LLC, and Acuity,
A Mutual Insurance Company,

    Third-Party Defendants.

| | |
|---|---|
| Opinion Filed: | July 30, 2021 |
| Submitted on Briefs: | April 17, 2020 |

| | |
|---|---|
| JUDGES: | Reilly, P.J., Gundrum and Davis, JJ. |
| Concurred: | |
| Dissented: | |

Case No.:
2019AP1085

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the third-party defendant-appellant Otto Jacobs Company, LLC, the cause was submitted on the briefs of *Sheila Shadman Emerson* and *Scott R. Halloin* of *Halloin Law Group, S.C.*, Milwaukee. |

2

Respondent          On behalf of the third-party defendant-respondent Acuity, a Mutual
ATTORNEYS:        Insurance Company, the cause was submitted on the brief of *Stuart R. Deardorff* and *Joseph M. Mirabella* of *Simpson and Deardorff, S.C.*, Milwaukee.

Case No.:
2019AP1086

Appellant           On behalf of the defendant-appellant Engerman Contracting, Inc., the
ATTORNEYS        cause was submitted on the briefs of *Thomas G. Gardiner* and *Richard C. Gleason* (admitted pro hac vice) of *Gardiner Koch Weisberg & Wrona*, Chicago, Illinois.

Respondents        On behalf of the defendant-respondent General Casualty Company of
ATTORNEYS:        Wisconsin, the cause was submitted on the brief of *Robert F. Johnson* and *Douglas M. Raines* of *von Briesen & Roper, S.C.*, Milwaukee.

On behalf of defendant-respondent West Bend Mutual Insurance Company, the cause was submitted on the brief of *Henry E. Koltz* of *Schmidt, Darling & Erwin*, Milwaukee.

**2021 WI App 51**

**COURT OF APPEALS
DECISION
DATED AND FILED**

**July 30, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal Nos. **2019AP1085**
　　　　　　 **2019AP1086**
**STATE OF WISCONSIN**

Cir. Ct. Nos. 2018CV319

**IN COURT OF APPEALS**

---

NO. **2019AP1085**

**5 WALWORTH, LLC,**

　　**PLAINTIFF,**

　V.

**ENGERMAN CONTRACTING, INC., WEST BEND MUTUAL INSURANCE COMPANY AND GENERAL CASUALTY COMPANY OF WISCONSIN,**

　　**DEFENDANTS,**

**DOWNES SWIMMING POOL CO., INC. AND THE CINCINNATI INSURANCE COMPANY,**

　　**DEFENDANTS-THIRD-PARTY PLAINTIFFS,**

　V.

**OTTO JACOBS COMPANY, LLC,**

　　**THIRD-PARTY DEFENDANT-APPELLANT,**

**ACUITY, A MUTUAL INSURANCE COMPANY,**

   **THIRD-PARTY DEFENDANT-RESPONDENT.**

---

**NO. 2019AP1086**

**5 WALWORTH, LLC,**

   **PLAINTIFF,**

 **V.**

**ENGERMAN CONTRACTING, INC.,**

   **DEFENDANT-APPELLANT,**

**WEST BEND MUTUAL INSURANCE COMPANY AND
GENERAL CASUALTY COMPANY OF WISCONSIN,**

   **DEFENDANTS-RESPONDENTS,**

**DOWNES SWIMMING POOL CO., INC. AND THE CINCINNATI
INSURANCE COMPANY,**

   **DEFENDANTS-THIRD-PARTY PLAINTIFFS,**

 **V.**

**OTTO JACOBS COMPANY, LLC, AND ACUITY,
A MUTUAL INSURANCE COMPANY,**

   **THIRD-PARTY DEFENDANTS.**

---

APPEALS from orders of the circuit court for Walworth County: DANIEL STEVEN JOHNSON, Judge. *Reversed and cause remanded with directions.*

2

Before Reilly, P.J., Gundrum and Davis, JJ.

¶1    DAVIS, J.  These consolidated appeals require us to address two common, and somewhat related, perceptions concerning standard commercial general liability (CGL) insurance policies.  The first is that such policies never cover an insured who is sued for the cost of replacing or repairing defective workmanship; the second is that such polices only cover liability for so-called "third-party" property damage.  Neither perception is entirely accurate.  Insurance policies "cover" what they say they cover.  By their terms, standard CGL policies—like those in this case—cover liability for damages the insured is legally required to pay because of property damage caused by an "occurrence," defined in pertinent part as simply an "accident."  A series of "business risk" exclusions preclude coverage for property damage that is to the insured's own work or product, thereby limiting coverage to "third-party" property damage—but these exclusions have important exceptions.  Likewise, court decisions construing the term "accident" have ruled that defective workmanship is not itself a covered accident—but have also found that defective workmanship might *cause* a covered accident.

¶2    Here, we explore the contours of these principles in the context of a residential construction project:  a pool complex consisting of two pools, a patio, and surrounding retaining walls.  The swimming pool bowl portion of the complex is alleged to have been negligently installed by a subcontractor of the insured, which led to cracking and water leaks, and, ultimately, required the demolition and reconstruction of the entire complex.  Alternatively, it is alleged that the problems with the pool were caused by defective shotcrete material; the supplier of that material, and its insurer, have been joined as defendants as well.  Although the facts remain murky and to a large extent undeveloped, there is enough in this record for us to conclude that the circuit court erred in finding that there could be no coverage

as a matter of law as to either of the insureds present on appeal. We therefore reverse and remand for further proceedings so that the coverage issues may be addressed under the standards set forth in this opinion.

## BACKGROUND

¶3     In 2012, Engerman Contracting, Inc. (Engerman) was the general contractor on a construction project at a residence owned by 5 Walworth, LLC (the Owner) in Lake Geneva, Wisconsin. The Owner asked Engerman to build a pool complex. Engerman subcontracted the project to Downes Swimming Pool Co., Inc. (Downes) (Downes is not a party to this appeal). Downes, in turn, purchased shotcrete (sprayed concrete) from Otto Jacobs Company, LLC (Jacobs) for the swimming pool walls and base.

¶4     The pool complex was completed around August 2012. It featured a raised forty-foot by twenty-foot main swimming pool and a smaller, adjacent children's pool. Wide stone decks surrounded both pools, displaying masonry elements (such as pillars, steps, and benches), and providing space for outdoor furniture. There were also plumbing and electrical support for gas lamps, a speaker system, and other accoutrements. Concrete and masonry retaining walls bounded the perimeter.

¶5     The Owner alleges that, upon completion, the pools "[a]lmost immediately" began leaking. On several occasions between 2012 and 2015, Downes tried, unsuccessfully, to fix the problem. In the summer of 2015, the Owner hired the engineering firm Wiss, Janney, Elstner Associates, Inc. (WJE) to investigate the leakage. According to the complaint, the resulting "WJE Report" determined "among other things, that the shotcrete material was not installed correctly, contributing to cracking in the pool walls" and "that the steel reinforcing

4

bars were not sufficient to prevent cracks in the pool walls." The Owner alleges that, as a result of the persistent leakage, it was forced to demolish the pool and construct a new one.

¶6 In May 2018, the Owner sued to recover the costs associated with removing and replacing the pool complex. It brought suit against (1) Engerman; (2) Engerman's insurers, General Casualty Company of Wisconsin (General Casualty) and West Bend Mutual Insurance Company (West Bend); (3) Downes; and (4) Downes' insurer. Against Engerman, the Owner sued for breach of contract, breach of implied warranty, and violation of WIS. STAT. § 100.18 (2019-20),[1] Wisconsin's Deceptive Trade Practices Act. The Owner further alleged two separate counts of negligence against Engerman and Downes.

¶7 Downes brought a third-party complaint against Jacobs and its insurer, Acuity, a Mutual Insurance Company (Acuity). That complaint alleges that Jacobs negligently provided inferior shotcrete to Downes. Engerman, for its part, asserted claims for contribution and/or indemnification against Downes and Jacobs.

¶8 Engerman and Jacobs tendered their defenses to their respective insurers, who defended under a reservation of rights. Each insurer then brought a motion for summary and declaratory judgment, alleging that there was no coverage under their policies and therefore no duty to indemnify or defend their policyholders. For purposes of this decision, the relevant language in each policy is identical. The policies state that the insurer will reimburse for "'property damage' to which this insurance applies," provided that the property damage is caused by an "occurrence." "Occurrence" means "an accident, including continuous or repeated

_____

[1] All references to the Wisconsin Statutes are to the 2019-20 version.

5

exposure to substantially the same general harmful conditions." The policies also outline business risk exclusions, precluding coverage for "Damage to Property," "Damage to Your Product," and "Damage to Your Work." We will discuss additional relevant policy language below; here, we note that these exclusions generally prohibit coverage where the only damage is to the insured's own work or product.

¶9 Engerman's insurers, West Bend and General Casualty, made two primary arguments as to why there was no coverage. First, that the Owner did not allege an "occurrence," and second, that the Owner did not allege "property damage" *other* than to Engerman's own work or product—the pool complex—itself. *See Wisconsin Pharmacal Co. v. Nebraska Cultures of Cal., Inc.*, 2016 WI 14, ¶24, 367 Wis. 2d 221, 876 N.W.2d 72. Jacobs' insurer, Acuity, separately echoed the argument concerning the lack of property damage, arguing that the shotcrete Jacobs supplied was a component part of an indivisible integrated system (the completed pool complex). As such, there was "no damage … to property other than ingredients of the integrated system and the completed product" and no coverage. *See id.*, ¶¶33-34.

¶10 The insurers presented several additional arguments. West Bend contended that coverage was precluded because the property damage occurred prior to the policy period. Acuity contended that, pursuant to the policy's business risk exclusions, there was no coverage for the cost associated with replacing the pool or replacing the surrounding structures.

¶11 The parties' supporting materials—in particular, the WJE Report— paint a more complete picture of the problems with the pool complex. The WJE Report summarizes "visual observations" of the following defects: (1) cracking in

the main pool walls and floor, with indications that "water [was] migrating into the pool from underlying saturated soils"; (2) "several cracks in the children's pool"; (3) in the pool deck, cracking in some of the paver stones that bordered the pool, along with widening of the joints between other pavers; and (4) cracking and other defects with various masonry walls (both within and surrounding the pool complex).

¶12    In its discussion and conclusions regarding the main pool, the report does not explicitly identify one cause of the cracking but also does not rule out suboptimal shotcrete mix or construction defects: [2]

> The steel reinforcing bars [in the pool] are relatively far … from the waterside faces of the pool walls and floor. As such, the reinforcing bars are not effective in controlling (reducing) crack widths at those surfaces. The absence of reinforcing steel near the concrete surfaces is the primary contributing factor as to why some of the crack widths are significantly wide.

> Based on the makeup of the constituent aggregates used in the shotcrete concrete and the environment of the pool, it is likely that volume changes [in the concrete] … will continue and cause new cracking or worsen existing cracking. This internal deterioration mechanism will likely continue because of the moist condition of the concrete, even if the cracks are repaired.

The WJE Report notes that the children's swimming pool "likely has the same probable cause of cracking, and we expect it to have similar long-term performance that is less than average." The report also discusses the results of core sampling taken of the pool shotcrete, determining that "porous and unconsolidated regions in

---

[2] In their summary judgment briefing, the parties put their own gloss on the conclusions of the WJE Report; however, there was no expert deposition testimony or affidavit submitted that synthesized the report in layman's terms. To some extent, this problem persists in the briefing to this court. We will highlight those portions of the WJE Report that all parties agree are relevant, but we will not draw any conclusions from the report other than those clearly stated in WJE's own words.

the shotcrete are the result of less than optimal installation and can contribute to cracking."

¶13    The WJE Report also discusses the defects in surrounding structures. It states that the retaining walls had moved and cracked, although it does not explicitly state why (it does, however, note that "[t]he probable cause of the extruded mortar joints [in the masonry] breaking is likely poor original installation … aggravated by" temperature damage).  As to the pool deck, it states that "[m]ovement to date of the pavers likely reflects corresponding settlement of the underlying supporting slab."  Finally, the report indicates that "significant water leakage" from the pool possibly caused saturation of the underlying soil, which, in turn, caused "the soils to heave horizontally (and vertically), further increasing pressures to potentially displace walls."

¶14    For our purposes, then, we can assume that the WJE Report implicates one or more possible causes of the pool leakage, including:  ineffective or insufficient steel reinforcing bars in the pool, improperly installed shotcrete, and suboptimal or improper shotcrete mixture.  We can also surmise from the WJE Report, at least at this juncture, that the continuous leaks from the pool resulted in an uneven and destabilized soil structure, which created pressures and was an additional factor in displacing the surrounding walls.

¶15    The circuit court issued an oral ruling granting the insurers' motions and denying coverage to Engerman and Jacobs.  Beginning with the Engerman insurers' arguments on coverage, the circuit court stated, "I simply don't find that there is an occurrence as that term is defined in the policy."  In the court's view,

> I think these claims do come down to faulty workmanship
> related to the construction of this pool…. [Based on the case
> law,] it's clear to me that the faulty workmanship alone

8

> cannot constitute an occurrence…. [Rather,] the cases seem to indicate that you need … two separate harms before you have coverage. You need to have the first harm which can certainly be faulty workmanship … but then you have to have some collateral consequences … in the form of a second harm from that faulty workmanship before you have coverage….
>
> And in this case I think the allegations really talk about that first level of harm, the damage to the pool without identifying a second or collateral consequence from it. We are talking about a situation where we have a defective pool structure that was built….

¶16 Engerman responded by attempting to show damage not just to the pool but to "surrounding structures." Engerman referenced the WJE Report as demonstrating that "[s]ubsiding soil … is no longer supporting not just the pool, but all of the other structures that were built including retaining walls, including a patio, including walkways and … [s]tone work that was there," rendering the "entire structure … no longer stable."

¶17 The court rejected this reasoning on the grounds that the only damage alleged was to the pool itself, the pool being a single unit:

> I consider the pool and the patio to be the accoutrements of the pool. I don't think that the pool is separate and distinct from the pool deck itself, for instance…. [T]his seems to me to be one pool structure and there are a lot of things that go into a pool [such as hand rails, steps and the patio].… I think we are talking about not just the physical bowl where water was put into ….

Based on this analysis, and in anticipation of appeal, the circuit court further held that there was no "property damage"—again, because there was no damage to

property other than the pool itself. *See* **Wisconsin Pharmacal**, 367 Wis. 2d 221, ¶24.[3]

¶18 The court then turned to Acuity's motion regarding Jacobs' coverage. In line with the above analysis, the court held that the shotcrete was part of an "integrated system"—the pool structure:

> You don't have a pool without Shotcrete. So we can't separate the Shotcrete out from the pool ….
>
> If I take the Shotcrete out of this pool, the pool doesn't have a wall. It's not a pool anymore. And so whether the deck and other things were harmed or not is not necessarily dispositive, it's sort of whether we have an integrated system ….
>
> ….
>
> When we talk about the pool and the pool deck and the retaining wall … the principal feature of that complex or that unit is the pool…. I just simply disagree that a deck has any purpose without the pool. And that's our case. I don't think it can be argued that these retaining walls and the deck around the pool have any … practical use without the pool being functional which it's not.

---

[3] The circuit court further found that there was no coverage arising out of the Owner's WIS. STAT. § 100.18 claim, because an intentional act cannot be an "occurrence." Engerman does not challenge this ruling on appeal, other than to point to its insurers' ongoing duty to defend. We agree with Engerman's insurers that this issue has been abandoned, and we therefore do not address this ruling in depth. *See* **A.O. Smith Corp. v. Allstate Ins. Cos.**, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998). We do note, however, that § 100.18 does not apply solely to intentional misrepresentations; the statute extends liability for any deceptive or fraudulent statement intended to induce a sale or similar action (i.e., it is not necessary that harm be intended). Analyzing coverage under a similar statutory scheme, our supreme court issued a fractured 3-2-2 split decision in **Stuart v. Weisflog's Showroom Gallery, Inc.**, 2008 WI 86, 311 Wis. 2d 492, 753 N.W.2d 448, in which a three-justice plurality appeared to adopt an "intent to induce" standard for when a representation is not an "accident," but left open the possibility of coverage for an "accidental misrepresentation," *see id.*, ¶¶40, 44 n.17; a two-justice concurrence opined that misrepresentations should be considered accidents so long as the injury or damage was unexpected and unintended, *see id.*, ¶¶70-71 (Bradley, J., concurring); and another two-justice concurrence opined that any misrepresentation could never be considered an accident, since it involves the volitional act of speaking, *see id.*, ¶99 (Roggensack, J., concurring). We need not explore how **Stuart** impacts this case since, again, Engerman does not challenge the underlying ruling on the § 100.18 claim.

Accordingly, the court held, there was no damage to property other than this "integrated system," and thus no coverage.

¶19    Because the court decided that there was no "property damage" caused by an "occurrence," it did not address the insurers' remaining arguments: that there was no West Bend coverage because the damage occurred prior to the policy period and that there was no Acuity coverage by virtue of the policy's business risk exclusions.

## DISCUSSION

*General Principles Concerning Insurance Coverage Disputes*

¶20    Our analysis begins with an important procedural point: each of the three insurers in this case agreed to defend their respective insureds in the underlying litigation (General Casualty and West Bend defending Engerman, and Acuity defending Jacobs). This circumstance fundamentally dictates our analysis. The standard commercial general liability (CGL) policy contains two general insurer obligations. The first is the duty to indemnify, or the insurer's obligation to pay, up to policy limits, any damages for which the insured is found liable, provided such damages fall within the coverage provisions of the policy and are not excluded. *Water Well Solns. Serv. Grp., Inc. v. Consolidated Ins. Co.*, 2016 WI 54, ¶14, 369 Wis. 2d 607, 881 N.W.2d 285; *Estate of Sustache v. American Family Mut. Ins. Co.*, 2008 WI 87, ¶22, 311 Wis. 2d 548, 751 N.W.2d 845; *American Family Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶24, 268 Wis. 2d 16, 673 N.W.2d 65. The second obligation is the duty to defend, in which the insurer agrees to undertake the insured's defense in any suit in which the insured is merely *alleged* to be liable for such damages. *Estate of Sustache*, 311 Wis. 2d 548, ¶20; *Stimac Family Trust*

11

*v. Wisconsin Power & Light Co.*, 2017 WI App 33, ¶7, 375 Wis. 2d 787, 896 N.W.2d 383.

¶21     Because Wisconsin law imposes harsh penalties on insurers who breach their duty to defend—including loss of the right to control the defense, loss of the right to contest coverage, a heightened interest obligation, and, potentially, a damages award for bad faith—a safe harbor of sorts has been created that allows insurers to avoid breaching their duty to defend by agreeing to defend under a reservation of rights, whereby the insurer defends while simultaneously contesting the duty to indemnify (i.e., coverage). *Estate of Sustache*, 311 Wis. 2d 548, ¶¶25-26.  To facilitate this procedure, the insurer has the right to seek to bifurcate the issues of coverage and the merits of the underlying case, with the issue of coverage addressed in advance of the merits to the extent it can be done so separately. *Id.* That safe harbor was invoked here:  the insurers have defended Engerman and Jacobs, and the parties have submitted evidence by way of affidavit.  This means that the issue before us involves only the insurers' duty to indemnify in the event that their insureds are found liable for damages. *See id.*, ¶¶28-29.

¶22     So what does this procedural posture mean for this case?  Initially, it precludes any potential liability for breach of the duty to defend (including the consequences described above).  But it also bears on how coverage is determined. When analyzing the duty to defend, we simply look to the four corners of the complaint and compare it to the policy to see if there is any potential for coverage— any such potential would trigger the duty and end further inquiry. *Id.*, ¶¶27-29.  But in a coverage analysis, the parties are not necessarily bound by the four corners of the complaint in determining whether there is coverage. *Id.*  They can introduce evidence showing the true facts (as opposed to those alleged in the complaint), and we can review such evidence in determining whether coverage exists, or at least

may exist, if the evidence results in liability against the insured following a trial on the merits of the underlying claims. *Id.*

¶23 Of course, at this stage of a case, it cannot always be determined whether there will be coverage. After all, we do not even know which, if any, of the insureds will be found liable, or on what grounds, or for which damages. Indeed, coverage issues often involve fact-based inquiries requiring a coverage trial either separately or in conjunction with the merits. In the absence of a trial or other fact-finding proceeding, our task is to review the submissions of the parties and address whether there is a possibility of coverage based on the pleadings and evidence before us. *Id.* If there is such a possibility then we cannot allow the insurer to be dismissed from the case or relieve it of its ongoing obligation to defend. But if the pleadings or summary judgment evidence indisputably demonstrate a lack of coverage, then the insurer can be dismissed from the case with a finding of no coverage.

¶24 Overlaying these principles are well-settled rules of construction concerning insurance policies. Wisconsin follows a three-part coverage methodology: we first look to the coverage part of the policy to see if the damages are covered in the first instance. *American Girl*, 268 Wis. 2d 16, ¶24. If they are, then we turn to the exclusions to see if such damages are excluded. *Id.* If an exclusion applies, we look to see if there is an exception to an exclusion that would restore coverage. *Id.* Any ambiguities will be construed against the insurer; the pleadings are to be liberally construed, with any reasonable inferences assumed in the insured's favor; and the policies are to be interpreted in accordance with the reasonable expectations of insureds. *Id.*, ¶23; *Sustache*, 311 Wis. 2d 548, ¶¶19-21. On the other hand, we cannot let these rules result in a finding of coverage for risks

that the insurer did not contemplate or underwrite, and for which it has not received a premium. ***American Girl***, 268 Wis. 2d 16, ¶23.

¶25 Armed with these principles, we now address whether the parties' submissions show that there is, or could be, coverage in the event of a liability finding, beginning with the general contractor, Engerman.

*Engerman May Be Entitled to Coverage From General Casualty*
*and West Bend Because There Is Evidence That Liability Exists*
*Because of Property Damage Caused by an Occurrence*

Defective workmanship of Engerman's subcontractor may be the cause of an "occurrence"

¶26 Engerman's case for coverage is based on its potential liability for the actions of its subcontractor, Downes, in allegedly building a pool with ineffective or insufficient steel reinforcing bars, improperly installed shotcrete, and/or suboptimal shotcrete mixture. Its insurers argue that this potential liability is not covered because the necessary element of an "occurrence" is missing. In essence, so the argument goes, because potential liability is based on defective workmanship, there can be no "occurrence," since defective workmanship is not an "accident."

¶27 Whether defective workmanship can itself be considered an "accident," and therefore an "occurrence," is a question that has divided courts around the country. Wisconsin has aligned with those courts ruling that defective

workmanship is not, in and of itself, an "occurrence."[4] *See **Glendenning's Limestone & Ready-Mix Co. v. Reimer***, 2006 WI App 161, ¶39, 295 Wis. 2d 556, 721 N.W.2d 704. Nonetheless, both our supreme court and this court have made clear that defective workmanship may *cause* an occurrence (i.e., an accident), resulting in property damage. This finely parsed distinction is exemplified by our supreme court's decision in *American Girl*, 268 Wis. 2d 16, ¶3, in which the court considered a soil engineer's faulty site-preparation advice that led to the construction of a building that began to sink, which in turn caused cracks in the flooring and the need to demolish the building. Although the faulty advice itself was not viewed as an "occurrence," the *effect* of that advice—the sinking of the building and flooring cracks—was an accident, and hence an "occurrence." *Id.*, ¶5.

¶28 Construction defect cases from this court, both preceding and following *American Girl*, offer further support for the idea that accidents and damage resulting from defective workmanship are covered. *See **Kalchthaler v. Keller Constr. Co.***, 224 Wis. 2d 387, 391, 397, 591 N.W.2d 169 (Ct. App. 1999) (leaking windows resulting from defective workmanship was an "occurrence");

---

[4] Wisconsin's view that defective workmanship is not an "occurrence" per se appears to be rooted in the notion that insurance coverage does not exist for "volitional acts." *See*, *e.g.*, ***Everson v. Lorenz***, 2005 WI 51, ¶19, 280 Wis. 2d 1, 695 N.W.2d 298. This premise, however, has never been consistently applied. *See*, *e.g.*, ***Patrick v. Head of the Lakes Coop. Elec. Ass'n***, 98 Wis. 2d 66, 70, 295 N.W.2d 205 (Ct. App. 1980) (term "occurrence" "affords coverage for an intended act and an intended result if they cause damage unintended from the standpoint of the insured" (citation omitted)); ***Kremers-Urban Co. v. American Emps. Ins. Co.***, 119 Wis. 2d 722, 742, 351 N.W.2d 156 (1984) (same). The parameters of the "volitional acts doctrine" are also far from clear as exemplified by the fractured result in *Stuart*, 311 Wis. 2d 492. *See* note 3. The controversy surrounding the doctrine is, frankly, not surprising since most, if not all, acts of negligence—the risk that liability insurance is designed to cover—involve "volitional acts," making the entire doctrine problematic. Nonetheless, precedent from cases such as ***Glendenning's Limestone & Ready-Mix Co. v. Reimer***, 2006 WI App 161, ¶39, 295 Wis. 2d 556, 721 N.W.2d 704, appears clear cut enough such that we are bound to the premise that defective workmanship is not in and of itself an "occurrence" under Wisconsin law, but with the added proviso that any unintended result of defective workmanship may well satisfy the "occurrence" requirement. *See **Cook v. Cook***, 208 Wis. 2d 166, 190, 560 N.W.2d 246 (1997).

15

*Glendenning's*, 295 Wis. 2d 556, ¶42 (damage by scraper to inadequately installed rubber mats in cow barn constitutes an occurrence; "[t]he damage was caused by an accident in that [it] was not intended or anticipated and it also was not intended or anticipated that using the scraper to clean the manure off the mats would damage the mats"); *Acuity v. Society Ins.*, 2012 WI App 13, ¶¶17, 24, 339 Wis. 2d 217, 810 N.W.2d 812 (wall collapse caused by "accidental soil erosion that occurred because of faulty excavation techniques" was an "occurrence"; "[t]he lessons of *American Girl*, *Glendenning's*, and *Kalchthaler* are that while faulty workmanship is not an 'occurrence,' faulty workmanship may cause an 'occurrence'").

¶29    We cannot rule out the possibility of a similar outcome in this case. There is evidence suggesting that Engerman, acting through its subcontractor, Downes, incorrectly installed shotcrete and used insufficient steel reinforcing bars. If coverage was sought for the cost of repairing or replacing the incorrectly installed materials, controlling precedent would hold that there was no "occurrence," and hence no coverage.  In this case, however, there is more than the mere cost of replacing defective workmanship.  There is evidence suggesting that the defective workmanship caused the pool walls to later crack and, in turn, the pool to leak.  The cracking, which stemmed from the defective workmanship, was certainly not intended and can only be described as both an "accident" and as a form of property damage.  Moreover, there is evidence suggesting that, as a result of the leaks, the soil was saturated and the pool complex had to be replaced in its entirety.  Assuming those facts to be true, which we must at this stage, this case is virtually

16

indistinguishable from *American Girl*.[5] Consequently, there remains the possibility of coverage.

The physical damage to the pool complex requiring its replacement constitutes "property damage" caused by an "occurrence"

¶30 Notwithstanding the above analysis, the circuit court denied coverage because of a perceived need for what it labeled a "collateral consequence." That is, the circuit court was of the view that the mere repair or replacement of property that is damaged because of defective workmanship cannot, alone, trigger coverage. Indeed, the entire tenor of West Bend's brief is that coverage does not exist here because this case involves the repair of defective workmanship.

¶31 In addressing whether potential liability comes within the coverage part, the issue is not about whether there is a collateral consequence but whether Engerman may be legally liable to pay damages "because of … property damage" caused by an "occurrence." "Property Damage" is a defined term; it simply means "physical injury to tangible property, including all resulting loss of use of that property." The pool complex was unquestionably "physically injured"—there are cracks throughout the structure which led, in the pool portion, to extensive leaking and soil instability, which allegedly caused the damage to worsen. If Engerman is found liable for that property damage, and the damage can be traced to an "occurrence"—an "accident"—then coverage is triggered by the terms of the policy, with the remaining question being whether an exclusion applies.

---

[5] Ordinarily, in cases where the property damage is alleged to consist of the repair or replacement of defectively performed work, the "your work" exclusion would apply to bar coverage. Where the work is performed by a subcontractor, however, that exclusion is typically (though not always) expressly inapplicable by its terms. *See American Family Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶67, 268 Wis. 2d 16, 673 N.W.2d 65. As we discuss below, the "your work" exclusions in the policies at issue here are subject to the subcontractor exception.

¶32     That the damages are measured by the need and cost to repair a defectively built structure is largely beside the point at this stage of the analysis. Although defective workmanship, standing alone, is not an "occurrence," as we have observed, where it *leads* to an occurrence there is coverage for whatever property damage results.

¶33     In reality, the need for a "collateral consequence" stems from a separate analysis, under either the "your work" or the "damage to property" policy exclusions.[6]  These exclusions state, in pertinent part:

> This insurance does not apply to:
>
> ….
>
> **Damage to Your Work**
>
> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."
>
> This exclusion does not apply if the damaged work or the work out of which the damages arises was performed on your behalf by a subcontractor.
>
> ….
>
> **Damage To Property**
>
> "Property damage" to:
>
> ….
>
> That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

---

[6] The circuit court's reference to a "collateral consequence" may have come from *Vogel v. Russo*, 2000 WI 85, ¶21, 236 Wis. 2d 504, 613 N.W.2d 177, *abrogated in part on other grounds by Insurance Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI 139, ¶25 n.6, 276 Wis. 2d 361, 688 N.W.2d 462.  Notably, the *Vogel* court used this terminology in its analysis of the business risk exclusions.

….

> [This paragraph] does not apply to "property damage"
> included in the "products-completed operations hazard."

¶34    Under the "your work" exclusion, coverage is indeed barred for the repair or replacement of the insured's work.  An important exception to that exclusion exists, however, for work "performed on your behalf by a subcontractor."  Here, all of the defective work alleged to have been performed by Engerman *was performed by Downes, Engerman's subcontractor*.  That takes the "your work" exclusion—and its bar on coverage for repair of defective workmanship—out of the picture.  Similarly, the "damage to property" exclusion bars coverage for "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."  But that exclusion, too, is subject to an important exception, in that it "does not apply to 'property damage' included in the 'products-completed operations hazard.'"  The "products-completed operations hazard" is a defined term; for our purposes, it means the point in time at which the work is complete.  In other words, where the work is completed—to take an example from this case, where the pool complex was fully installed—then the "damage to property" exclusion does *not* apply to damage that occurs from that point forward that can be traced to an "occurrence," including accidental damage or injury that results from defective workmanship during construction.

¶35    The exclusions, in short, help frame the proper analysis.  The "your work" exclusion is almost certainly inapplicable, assuming liability is based on the work of Downes as a subcontractor.  As for the "damage to property" exclusion, at this stage we cannot rule out the possibility that the pool was complete when the damage occurred, and if that is the case, this exclusion is also inapplicable.  We also cannot rule out that there was damage to something other than just the "particular

part" of the property where work was "incorrectly performed"; that is, it was not just the swimming pool bowl that was damaged but the entire pool complex. *See Acuity*, 339 Wis. 2d 217, ¶40.

¶36    If we accepted the insurers' position (that the coverage part of the policy does not encompass the repair of work performed and completed by the insured), this would render these exclusions meaningless and read the important exceptions to them out of the policy altogether. *See American Girl*, 268 Wis. 2d 16, ¶47 ("Why would the insurance industry exclude damage to the insured's own work or product if the damage could never be considered to have arisen from a covered 'occurrence' in the first place?"); *see also United States Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 886-87 (Fla. 2007) (quoting *American Girl* for the assertion that "if the insuring provisions do not confer an initial grant of coverage for faulty workmanship, there would be no reason for U.S. Fire to exclude damage to 'your work'"); *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 12 (Tex. 2007) ("By incorporating the subcontractor exception into the 'your-work' exclusion, the insurance industry specifically contemplated coverage for property damage caused by a subcontractor's defective performance."). This is a reading we cannot give to the policy. *See Day v. Allstate Indem. Co.*, 2011 WI 24, ¶27, 332 Wis. 2d 571, 798 N.W.2d 199 ("[C]ourts must avoid a construction which renders portions of a contract meaningless, inexplicable or mere surplusage." (citation omitted)).

¶37    General Casualty goes so far as to suggest that a blanket "third-party property" requirement, although not set forth in the policy's coverage grant, was essentially created out of whole cloth by our supreme court in *Wisconsin Pharmacal*. We will delve more fully into *Wisconsin Pharmacal* in our discussion of the coverage issues concerning Jacobs. For purposes of this discussion, suffice

20

it to say that we do not read *Wisconsin Pharmacal* as importing language that does not exist into a policy, particularly where doing so would favor the insurer who wrote the policy and, as we just noted, read language *out* of the policy. Moreover, *Wisconsin Pharmacal* did not involve defective workmanship but, rather, a nonfunctioning product—a probiotic pill that did not perform as intended because it contained the wrong ingredient. *See Wisconsin Pharmacal*, 367 Wis. 2d 221, ¶¶4-6. This leads to a further insight: the nonfunctioning product there did not involve property damage at all because, quite simply, the product did not "physically injure" any property—it simply did not perform as a dietary supplement. *See id.*, ¶¶36-37.

¶38 In reality, unless we ignore the language of the policies, the requirement of "third-party damage" noted in *Wisconsin Pharmacal* must be read as a shorthand reference to the "your product" and "your work" exclusions (which bar coverage for the repair or replacement of a defective product manufactured by the insured or to replace defective workmanship), or to the requirement that mere diminution in value is not "physical injury" to property. This conclusion is consistent with the facts of that case and the language of the insurance policy (as General Casualty appears to implicitly acknowledge), and even seems evident from the cases *Wisconsin Pharmacal* cites for this point. *See id.*, ¶24 (citing cases); *Wisconsin Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 2000 WI 26, ¶32, 233 Wis. 2d 314, 607 N.W.2d 276 (holding labeling company was not entitled to coverage for labeling products with incorrect pricing since there was only diminution in value and no "physical injury" occurred to mislabeled products); *Vogel v. Russo*, 2000 WI 85, ¶19, 236 Wis. 2d 504, 613 N.W.2d 177 (noting that business risk exclusions generally operate to exclude coverage for damage to the

insured's own work or product),[7] *abrogated in part on other grounds by **Insurance Co. of N. Am. v. Cease Elec., Inc.**, 2004 WI 139, ¶25 n.6, 276 Wis. 2d 361, 688 N.W.2d 462. And, in **American Girl**, the only damage—the warehouse that had to be demolished because of cracking that was the result of faulty soil advice—was to the insured's own work. Coverage existed *only* because of the subcontractor exception to the "your work" exclusion. **American Girl**, 268 Wis. 2d 16, ¶¶48, 67-74. All of that being the case, the insurer's arguments must be read in reference to these principles—*and that means that defective work performed by a subcontractor may very well be covered, even if the only damage is to the completed work performed by the subcontractor*.

¶39 To reiterate, neither the alleged misapplication of shotcrete nor the improper installation of reinforcing bars—i.e., defective workmanship—is an occurrence by itself. But the resulting cracks, which continued to worsen as the pool leaked and destabilized the surrounding soil, neither of which were intended, satisfies the requirement of an "accident" that causes "property damage" sufficient to fall within the coverage part of the policy. The exceptions to exclusions that would otherwise bar coverage in the absence of a "collateral consequence" means that there are, at the very least, issues of fact precluding summary judgment as to the existence of coverage.

Engerman will not be entitled to coverage from West Bend if, prior to issuance of the policy, it was aware that any property damage had begun to occur

¶40 As alternative grounds for affirmance, West Bend argues that any property damage for which coverage is sought occurred prior to the policy period.

---

[7] **Vogel** involved work performed by a subcontractor, but the issue before the court involved the subcontractor's own CGL policy. *See **Vogel***, 236 Wis. 2d 504, ¶¶3-9. Therefore, the subcontractor exception could not come into play.

It also argues that Engerman was aware of the property damage. These arguments stem from related but separate provisions of the policy, which read as follows:

> b. This insurance applies to "bodily injury" and "property damage" only if:
>
> ….
>
> (2) The "bodily injury" or "property damage" occurs during the policy period; and
>
> (3) Prior to the policy period, no insured [or authorized "employee"] knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

¶41    The provisions invoked by West Bend, while related, actually involve two separate concepts. The language of provision (b)(2), requiring that property damage occur during the policy period, deals with the necessity that coverage be "triggered"; that is, that at least some property damage (or bodily injury) take place during the policy period before there can be coverage at all. It is not necessary that all of the damage take place but only some of it, and in many cases of this nature, damage can take place over time. *See **American Girl***, 268 Wis. 2d 16, ¶75.

¶42    Provision (b)(3), that coverage only exists if no insured is aware of the loss prior to policy inception, deals with a different issue. Often called a "known loss" provision, it bars coverage—even if a portion of the loss occurred during the policy period (thereby satisfying that portion of the trigger requirement)—if an insured knew that the loss had begun to occur prior to the policy period. ***Id.***, ¶¶85-86.

23

¶43 West Bend has invoked both of these provisions. Although they are each potentially applicable, we conclude that the record is insufficiently developed to declare, as a matter of law, that coverage was not triggered under the West Bend policy, or that Engerman was aware that the loss had begun prior to inception of the West Bend policy.[8]

*Otto Jacobs Is Entitled to Coverage for Any Damages
for Which It Is Found Liable Other Than for
Repair or Replacement of the Shotcrete It Sold*

The swimming pool complex is not an "integrated system," as that term is used in ***Wisconsin Pharmacal***

¶44 Jacobs, it will be recalled, was brought into this case by Engerman as a third-party defendant. Engerman alleged that, if it were found liable for the cracking in the pool, then Jacobs (and, more specifically, Jacobs' shotcrete) was the real culprit. Engerman seeks contribution on that basis. Acuity, Jacobs' insurer, was brought into the case under the direct action statute. *See* WIS. STAT. § 632.24; *see also* WIS. STAT. § 803.04(2). Acuity brought a coverage motion in which it submitted evidence consisting of the WJE Report and Engerman's bid proposal. Neither of these documents points the finger at Jacobs (or the shotcrete it sold to Downes) as the cause of damage to the pool.

¶45 Without evidence going to Jacobs' liability, we are in no position to determine whether there is any possibility that Jacobs will be found liable and, therefore, whether there will ever be a need for coverage from Acuity. In fact, we

---

[8] As Engerman correctly notes, the circuit court made no ruling concerning the "trigger" or "known loss" provisions, and West Bend did not seek such a ruling on summary judgment. In addition, the evidence submitted by the parties sheds little light on whether there was at least some injury occurring after inception of the West Bend policy. Whether Engerman knew or substantially knew about the injury appears to need further factual development. *See **American Girl**,* 268 Wis. 2d 16, ¶¶85-86.

24

do not read Acuity's motion as raising that issue (and it likely could not, since that would have to await a trial or other disposition on the merits). Instead, Acuity argues that, assuming the shotcrete was defective, there has been no "occurrence" and no "property damage" for purposes of insurance coverage; more specifically, that there has been no "accident" for purposes of finding an "occurrence" and that any property damage was not "third-party" property damage. In light of the procedural limitations presented by this case, we will confine our analysis to the narrow questions raised by Acuity as grounds for denying coverage at this stage of proceedings. Acuity argues that, as a matter of law, there is no "occurrence" and no "property damage," and that the "your product" exclusion applies to bar coverage in any event.

¶46 To adequately address these issues, it is appropriate to start with the terms of the insurance policy. Again, the policies indemnify the insured for "those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies." As relevant here, the insurance "applies" to property damage if it "is caused by an occurrence." "Property damage" is a defined term: it means "physical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." "Occurrence" is also a defined term: it is simply "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

¶47 With respect to the "occurrence" requirement, Acuity argues that this element is lacking because this case is based on "faulty workmanship," and faulty workmanship is not an occurrence. We have addressed this premise above in discussing Engerman's potential liability. Suffice it to say that Acuity's argument about faulty workmanship is misplaced, and generally adds further confusion to

what is already an opaque area of the law. That is because Jacobs did not provide "workmanship"—it provided *a product*. That *product* is alleged to be defective and, as a result, to have caused the damage to the pool. If that allegation is true, it means that the defective product is what caused the cracking in the pool, not any defective workmanship. Property damage caused by a defective product may very well be considered as caused by an "accident," thereby meeting the "occurrence" element of the coverage analysis. Product manufacturers purchase CGL coverage to guard against this very risk, and to hold otherwise would essentially eliminate coverage altogether for cases involving defective products.

¶48 This leads us to what we view as the crux of Acuity's argument: that there is no "property damage." Specifically, Acuity argues that the shotcrete supplied by Jacobs needed to (but did not) cause some type of "third-party" property damage to trigger coverage. This argument is based on the notion that the shotcrete and the pool deck area where it was applied are all part of an "integrated system." Consequently, the only damage caused by the shotcrete is, in essence, to itself, meaning there is no third-party property damage.

¶49 To address this argument, we will start with the language of the policy. As we have previously discussed, nothing in the *coverage* portion of the policy— neither the coverage grant language, nor the definitions spelling out the meaning of the terms employed—can reasonably be read to require "third-party" property damage. Rather, the policy initially covers any type of damages that the insured is legally required to pay "because of" property damage to which the policy applies. "Property damage," again, is "physical injury to tangible property." Taken alone, then, these provisions grant coverage to a product manufacturer for legal liability it incurs because of property damage—regardless of whether it is "third-party" property, and even if damage to the product itself are the only damages alleged.

But, of course, the coverage analysis does not end with the coverage part of the policy; we must next examine the exclusions. And here we find the "your product" exclusion, which reads:

> This insurance does not apply to:
>
> ….
>
> **Damage to Your Product**
>
> *Property damage* to *your product* arising out of it or any part of it.
>
> ….
>
> "*Your product:*"
>
> Means … [a]ny goods or products other than real property, manufactured, sold, handled, distributed or disposed of by … [y]ou….

¶50 This exclusion is where the contractual basis for a "third-party property" requirement comes into play in cases where a defective product is involved, and it has important implications for commercial liability insurance. As previously explained, the "your product" exclusion is one of a series of exclusions known as the "business risk" exclusions, the purpose of which is to bar coverage for the liability risk that the insured will be sued purely for the failure of a product or service to perform as expected or promised. This is a fundamental liability insurance principle. Insurance companies decided many years ago that they had no desire to insure the mere cost of replacing or repairing defective products, which are part and parcel of a repair and replace warranty and are considered a "business risk." The "your product" exclusion serves this purpose by imposing what amounts to the "third-party property damage" requirement that Acuity asserts as grounds for denying coverage to Jacobs for the cost of replacing or repairing the allegedly defective product sold by it.

27

¶51    The question, then, is what is the "product" that is to be considered for purposes of this exclusion.  Acuity's argument is that the "your property" exclusion precludes coverage because the shotcrete (the product Jacobs supplied) became inseparable from the pool complex in which it was used.  Acuity relies on the economic loss doctrine (ELD), which precludes tort liability for a defective product where the only harm is to the product itself, combined with a corollary principle to that doctrine holding that components of an "integrated system" cannot be viewed as causing harm to property other than the defective product.  Although the ELD is a tort remedies concept, Acuity cites *Wisconsin Pharmacal*, 367 Wis. 2d 221, ¶¶31-34, for the proposition that it is applicable to the determination of whether there is harm to "other property" for insurance coverage purposes.

¶52    *Wisconsin Pharmacal* involved the use of a wrong ingredient in the creation of a probiotic pill designed for use as a dietary supplement.  *Id.*, ¶¶4-6.  The ingredient did not cause injury to those taking the supplement but did render the pills ineffective as a dietary supplement.  *Id.*  The manufacturer of the supplement was forced to recall the supplement at its expense, and it thereafter sued the supplier of the faulty ingredient, its distributor, and their insurers for the costs of doing so.  *Id.*, ¶¶6-7.  The issue was whether these defendants had coverage under their standard CGL policies that covered liability for property damage stemming from an occurrence and containing a standard "your product" exclusion barring coverage for damage to the insured's own product.  Our supreme court held that there was no coverage because there was no "third-party" property damage.  While recognizing that the ELD does not control insurance coverage disputes, *id.*, ¶32, the court nonetheless ruled that the ELD's "integrated systems" test can be employed when "evaluating coverage" in such disputes.  *Id.*, ¶¶28, 31.

28

¶53    The manufacturer argued that there was damage to more than its own product because its ingredient had rendered the pill, as a whole, ineffective. *See id.*, ¶¶26, 34. The supreme court rejected this analysis:

> Pharmacal argues that there was physical injury due to blending other ingredients with [the wrong ingredient] into tablets. However, there was no factual foundation presented from which one could conclude that creating tablets using [the wrong ingredient] physically altered other ingredients in a way that would not have occurred if [the right ingredient] had been used in the same tableting process. Stated otherwise, any changes to other ingredients were not a result of the defective ingredient; rather, any changes were a result of the tableting process that would have occurred regardless of which probiotic ingredient was supplied. Yet, property damage under the first definition in the [insurance] policy requires *physical injury* to tangible property that is caused by the insured. Accordingly, we conclude that there was no "physical injury to tangible property."

*Id.*, ¶37.

¶54    The above passage suggests that the supreme court's reasoning was based on the notion that there was no evidence from which the court could conclude that use of the wrong ingredient caused "physical injury" to the other parts of the pill as required by the "property damage" definition. Instead, because all of the ingredients had become integrated into a single system, the other ingredients were simply unusable for the purpose for which the manufacturer intended—a dietary supplement. As a result, the supplement was non-functional for its intended use. It had no value.

¶55    In that regard, *Wisconsin Pharmacal* is little different than *Wisconsin Label*, a case which *Wisconsin Pharmacal* cites and relies upon, and which stands for the proposition that the mere diminution in value of the insured's product does not meet the "physical injury" requirement necessary to constitute "property damage." *Wisconsin Label*, 233 Wis. 2d 314, ¶48. Just as a product affixed with the wrong price has been diminished in value but suffered no physical injury, so a

tablet that has been infused with an ineffective ingredient has been diminished without physical injury.

¶56 In this case, there appears to be more than simply a pool rendered unusable without physical injury to property. There is at least some proof to the effect that the allegedly defective shotcrete did cause such injury. Specifically, it is alleged that the product was defective, and that, upon its application, it caused damage to the pool structure through cracking and leaking. This in turn led to leaks and cracks in the retaining walls stemming from the instability of the surrounding soil, which eventually necessitated demolition of the entire structure. Only if the entire pool complex is somehow considered part of the shotcrete can this be considered a case where Jacobs' product alone was damaged. And that is not a logical conclusion to draw from the terms of the policy, or from *Wisconsin Pharmacal*, for the reasons previously explained.

¶57 In reaching this conclusion we are guided by a Seventh Circuit case, *Haley v. Kolbe & Kolbe Millwork Co.*, 866 F.3d 824, 826 (7th Cir. 2017). In *Haley*, the plaintiffs were a class of homeowners who purchased windows from Kolbe. *Id.* The plaintiffs alleged that the windows were defective and caused leaking into the homes. *Id.* In addition to having to replace the windows, the plaintiffs claimed the leaks damaged other portions of the homes. *Id.* Citing *Wisconsin Pharmacal*, the insurers argued that there was no coverage because each home was an "integrated system," and that, as a result, there was no property damage to anything other than the defective product. *Id.* at 827. The district court agreed, finding that *Wisconsin Pharamacal* controlled the coverage issue. *Id.*

¶58 The Seventh Circuit reversed and, in the process, distinguished *Wisconsin Pharmacal*. The court observed that, in *Wisconsin Pharmacal*, "the

various components could not be 'separate[d] out' from the larger product." *Haley*, 866 F.3d at 829 (citation omitted). In *Wisconsin Pharmacal*, the remaining ingredients did not suffer any type of physical harm—they just were not able to be used for their intended purpose because of the wrong ingredient. *See Wisconsin Pharmacal*, 367 Wis. 2d 221, ¶37. In contrast, in *Haley*, the other components of the homes were alleged to have suffered physical injury; there were allegations, for example, of stained walls and buckled plaster. *See Haley*, 866 F.3d at 826, 829-31.

¶59 This case comes much closer to *Haley* than it does to *Wisconsin Pharmacal*. We agree with the Seventh Circuit that to "read [*Wisconsin*] *Pharmacal* as mandating an integrated-system analysis in (and as importing the entirety of Wisconsin's integrated-system case law into) all general-liability insurance disputes" would "stretch[ *Wisconsin*] *Pharmacal* beyond its intended reach." *See Haley*, 866 F.3d at 826, 829. We further note that this result is consistent with the reasonable expectations doctrine, previously referenced, whereby insurance coverage is to be analyzed based on the reasonable expectations of insureds. *See Sustache*, 311 Wis. 2d 548, ¶19. Although this issue has a bit of a "how many angels will fit on to the head of a pin" aspect to it, at the very least, it can certainly be said that any reasonable insured would expect liability coverage for damages that go beyond the "business risk" of simply replacing a defective product. Physical injury to other property that *results* from defective products are exactly what commercial liability insurance is designed to cover.

The "your product" exclusion cannot be determined as applicable on this record

¶60 If the pool is not considered an "integrated system," that leaves the question as to whether there is any basis on which to find the "your product" exclusion applicable at this juncture. We conclude that there is not. To the contrary,

31

this is not a case in which the damage was limited to repair or replacement of the (allegedly) defective shotcrete. Rather, the defective shotcrete led to cracking, leaking, and ultimately destabilized the structure, which necessitated its replacement. Unlike in *Wisconsin Pharmacal*, there is no evidence proving that replacement of the pool structure was made necessary simply because the shotcrete had become inseparable from the rest of the structure without any physical injury. Rather, like the building in *American Girl*, replacement became necessary because the rest of the structure *did* suffer physical injury—it was cracked, it leaked and ultimately caused a destabilized soil environment—all as a result of the (allegedly) defective shotcrete.

> *By the Court.*—Orders reversed and cause remanded with directions.